UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Gibbs International, Inc., | ) Civil Action No.: 7:15-cv-4568-BHH |
| | ) |
| Plaintiff and Counter Defendant, | ) |
| vs. | ) |
| | ) |
| ACE American Insurance Company | ) **Opinion and Order** |
| doing business as ACE USA, | ) |
| | ) |
| Defendant and Counter Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Southern Recycling, LLC, | ) |
| | ) |
| Third Party Defendant. | ) |

This matter is before the Court on Defendant and Counter Plaintiff ACE American

Insurance Company's ("Defendant" or "ACE") motion for summary judgment. (ECF No.

53.) For the reasons set forth in this Order, Defendant's motion for summary judgment

is granted.

## BACKGROUND

### I.    The Unsuccessful Copper Shipment and its Fallout

This coverage action stems from an apparent fraud perpetrated by a nonparty to

this litigation on Plaintiff and Counter Defendant Gibbs International, Inc. ("Plaintiff" or

"Gibbs") and Third Party Defendant Southern Recycling, LLC ("Southern Recycling"). In

short, thirteen (13) shipping containers that Gibbs and Southern Recycling believed to

contain scrap copper were transported from the Philippines to Texas, whereupon it was

discovered that some of the containers were filled with concrete blocks and others were

filled with black powder ("slag").

On October 30, 2012, Gibbs contracted with seller Regent Phoenix Imports & Exports, a Philippine company ("Regent Phoenix"), to purchase 500,000 pounds, plus or minus 3%, of "No. 1 copper wire that shall consist of bare, uncoated, unalloyed copper wire" at a price of six thousand two hundred dollars ($6,200.00) per metric ton. (Am. Answer, Ex. B, ECF No. 24-2 at 2.) The delivery term in the Regen Phoenix agreement stated: "FOB loaded in bulk into 20['] sea containers at port of Manila, Philippines. Shipments and delivery must be completed no later than November 30, 2012. The Parties will agree to dates, locations, and loading times for containers." (*Id.*) Under "Additional Terms" the agreement reads, *inter alia*: "[Regent Phoenix] warrants that it has absolute right, title and interest in and to the copper and is selling the copper to [Gibbs] free and clear of any and all encumbrances." (*Id.*) Moreover, the agreement indicated that Regent Phoenix was responsible for "all costs of loading, inland freight to Manila port, loading of containers on vessel, [and] providing all export documentation as required by Philippine customs." (*Id.*) Gibbs, on the other hand, was "responsible for Ocean shipment." (*Id.*) The agreement further stated, "If any portion of the copper covered by this contract is unshipped or undelivered within the specified time, then that portion is subject to cancellation by [Gibbs] and/or [Gibbs] has the right to hold [Regent Phoenix] responsible for substantiated damages." (*Id.*)

One week later, on November 6, 2012, Gibbs entered an agreement with buyer Southern Recycling to sell 500,000 pounds of copper wire conforming to the same quality specifications itemized in the Regent Phoenix agreement. (*See* Am. Answer, Ex. C, ECF No. 24-3 at 2.) It is undisputed that the copper wire Gibbs intended to purchase

from Regent Phoenix and the copper wire Gibbs intended to sell to Southern Recycling were the same. The Southern Recycling contract's delivery term stated:

> F.O.B., loaded in bulk into [Southern Recycling's] 20' sea container[s] at Port of Manila, Philippines. Shipments and delivery to be completed no later than November 30, 2012. [Southern Recycling] and [Gibbs] will mutually agree upon dates, location, and loading times for containers. [Southern Recycling] will have a representative at each loading and will sign each trucker's bill of ladings [sic], along with [Gibbs'] representative.

(*Id.*) Under "Other Terms" the contract reads, *inter alia*:

> Payment to be made via wire transfer to [Gibbs'] designated banking account the following business day upon [Southern Recycling's] inspection and acceptance of goods, and [Gibbs'] delivery as described above. Incremental payments will be made on each shipment.

(*Id.*) Additionally, the contract stipulated, "If any portion of the goods covered by this contract are unshipped or undelivered within the specified time, then that portion is subject to cancellation by [Southern Recycling] and/or [Southern Recycling] has the right to hold [Gibbs'] responsible for substantiated damages." (*Id.*)

Even a cursory examination of the Regent Phoenix agreement and the Southern Recycling contract reveals that they are very similar and in many instances use identical language. (*See* ECF Nos. 24-2 & 24-3.) However, one notable difference is that Regent Phoenix, as seller to Gibbs, warrants that it has an absolute right, title, and interest in and to the copper it is selling and that such sale is free and clear of any encumbrance. (ECF No. 24-2 at 2.) Whereas Gibbs, as seller to Southern Recycling, makes no such warranty or claim. (*See* ECF No. 24-3.)

Pursuant to these agreements, Southern Recycling arranged for the placement of thirteen (13) shipping containers at the Port of Manila. The containers were collected by Regent Phoenix and transported to its inland warehouse in Sucat, Philippines where

loading was to occur. Both Gibbs and Southern Recycling had representatives present at the warehouse to observe the loading. Southern Recycling had a corporate representative, Justin Morgan, and a professional inspector, Alex Stuart Intercorp Inspection Philippines, Inc. ("ASI"), present. Gibbs was represented by Paul Hemsath, COO of Spartan Mining and Development Corp.—a Gibbs joint venture involved in surface iron mining—who was located in Manila at the time.[1] The warehouse in Sucat could not accommodate all thirteen shipping containers at once, and loading was generally achieved by two containers per day over a period of several days. The basic process of moving the copper was supposed to proceed in the following fashion: (i) the shipping containers arrived at the Regent Phoenix warehouse where they were filled with copper; (ii) the shipping containers were transported by truck from Sucat to the Port of Manila; (iii) the containers were loaded onto a cargo ship at the Port; (iv) the containers were transported by ship from the Philippines to Long Beach California; and (v) the containers were transported overland in the United States by rail from California to Dallas, Texas. (*See* Biggerstaff Dep. 105:6-106:23, ECF No. 54-7 at 29; Ford Dep. 62:8-63:1, ECF No. 54-11 at 18.)

While the corporate representatives observed, the inspector retained by Southern Recycling—ASI—inspected the quality of the copper, watched Regent Phoenix employees load the copper into the containers, documented the weight of the copper being loaded throughout the process, photographed the loading process at various stages, and witnessed seals being affixed to the loaded containers. (Dignos Dep. 15:22-30:16, 83:2-84:18, ECF No. 54-10 at 15-30, 83-84.) The inspector

---

[1] Mr. Hemsath estimated that he was present at the warehouse for about half of the days required for loading. (Hemsath Dep. 37:1-9, ECF No. 53-8 at 4.)

generated daily reports reflecting material specifications about the quality and quantity of the loaded copper. (*Id.*)

The loading began on November 24, 2012 and concluded on December 1, 2012. (Ford Dep. 137:23-140:4, ECF No. 54-11 at 37.) Ten (10) of the containers stayed at the inland warehouse overnight after being loaded, and two of those ten containers stayed two nights. (*Id.* 82:10-12.) The first containers arrived at the Port on November 26, 2012, and the ship with the containers sailed from Manila on December 2, 2012. (Biggerstaff Dep. 130:6-12, ECF No. 54-7 at 35; Copper Shipment Charts, ECF No. 54-3.) Neither Gibbs nor Southern Recycling personnel were continually present during the period between the sealing of the containers and their departure from the warehouse, or during the transit from the warehouse to the Port. Outside the gates of the Port, the exterior, but not the contents, of the containers were inspected and photographed again. (Ford Dep. 54:13-23, ECF No. 54-11 at 16.)

When a truck transporting a container entered the gates of the Port, various items of data were recorded. Upon the same truck departing the Port, an Equipment Interchange Receipt ("EIR") was generated and provided to the driver. The EIR showed "the date and time of the receipt of the container, the truck that delivered, whether there was any damage observed to the container, and the driver's name and, also, the weight of whatever was lifted off the vehicle." (*Id.* 57:1-9.) In this case, the weights recorded by the Port were consistent with the weights of the containers upon their arrival in Texas. (*Id.* 61:15-62:2.) However, for five of the thirteen containers there were "significant differences" (in the order of two metric tons per container) between the weights on the EIRs that Regent Phoenix submitted to Gibbs for payment and the weights recorded on

the EIRs at the Port and upon arrival in Texas. (*Id.* 58:17-19, 63:7-64:25.) Accordingly, it is apparent that "Regent Phoenix or their associated transport companies, obtained the first print [EIRs], and that they manipulated these, in the process of them presenting photocopies . . . to Gibbs and [ASI]." (*Id.* 66:21-67:1.) The containers with the biggest weight differentials contained cement blocks upon arrival in Texas. (*Id.* 58:20-24.) The weight differences for containers that ultimately contained slag were not as significant. (*Id.* 59:5-9.)

The distance from the Sucat warehouse to the Port, as a function of driving time, was approximately two hours depending on traffic. The following table contains loading and departure dates, along with other data, for each of the thirteen shipping containers:

| Loading Order | Container | Date Loaded with Copper | Date Departed for the Port | Date Arrived at the Port | Trip Time from Sucat to Port | Contents Upon Arrival in Dallas, TX |
|---|---|---|---|---|---|---|
| 1 | TCKU3734138 | 11/24/12 | 11/26/12 | 11/26/12 | 2:35 | slag |
| 2 | OOLU1247369 | 11/24/12 | 11/26/12 | 11/26/12 | 2:21 | slag |
| 3 | OOLU1733709 | 11/26/12 | 11/27/12 | 11/27/12 | 2:54 | slag |
| 4 | OOLU3012492 | 11/26/12 | 11/27/12 | 11/27/12 | 2:46 | slag |
| 5 | OOLU1184677 | 11/27/12 | 11/27/12 | 11/27/12 | 5:24 | blocks |
| 6 | OOLU1382306 | 11/27/12 | 11/28/12 | 11/28/12 | 6:30 | blocks |
| 7 | OOLU1969269 | 11/28/12 | 11/29/12 | 11/29/12 | 3:01 | slag |
| 8 | OOLU2934539 | 11/28/12 | 11/30/12 | 11/30/12 | 1:50 | slag |
| 9 | OOLU1362721 | 11/29/12 | 11/30/12 | 11/30/12 | 2:10 | slag |
| 10 | OOLU1262656 | 11/29/12 | 11/30/12 | 11/30/12 | 2:33 | blocks |
| 11 | OOLU1156084 | 11/30/12 | 11/30/12 | 12/01/12 | 4:18 | blocks |
| 12 | OOLU3788423 | 11/30/12 | 12/01/12 | 12/01/12 | 4:24 | blocks |
| 13 | OOLU1130855 | 12/01/12 | 12/01/12 | 12/01/12 | 5:27 | blocks |

(*See* ECF No. 54-3.) The truck drivers explained protracted delivery times by telling ASI representatives that there was rush hour traffic during the transport of containers 5 and 6, that an armed escort accompanied container 12, and that there was heavy traffic during the transport of container 13. (Dignos Dep. 43:18-47:10, ECF No. 54-10 at 43-47.)

Subsequent investigation revealed evidence of tampering, specifically: (a) "[t]he bolts attaching the lock fittings to the [container] door were tampered with to allow all the lock fittings to be removed from the door, to allow the door to be opened normally and closed again normally, and then the lock fittings reattached [without breaking the seals];" (b) "the large tags holding the numbers of the red [ASI] seals, had been bent to gain access to the bolt behind them, and that bending was apparent because the plastic takes on a different color," and (c) "the long loose end of the plastic strip had been rethreaded in very different ways through the handle and the locking mechanism, indicating that that had been unwound at some point and then put back differently." (Ford Dep. 28:15, 32:16-33:2, ECF No. 54-11 at 9-10.) These indicia of tampering were observed by comparing photographs taken by ASI when the containers were sealed at the warehouse with photographs taken by ASI at the Port gate. (*Id.*)[2]

Based on his evaluation of the available evidence, the investigator concluded that the copper contents of the containers loaded each day were "recycled" and substituted for concrete block or slag either at the warehouse in Sucat or en route to the Port—i.e., that the same fifty (50) tons, approximately, of copper was loaded into each set of containers in succession. (*Id.* 58:25-59:17, 158:21-160:4, 165:23-168:5.) This conclusion was based on: (1) confirmations from the ASI inspectors and Gibbs' representative, Mr. Hemsath, that they never observed more than the approximate contents of two shipping containers' worth of copper together during loading; and (2) examination of the daily photographs taken by ASI. (*Id.* 166:8-18.) Regarding the photographs, the inspector testified:

---

[2] The investigation was conducted by Royston Ford, on behalf of CNA Insurance Company, Southern Recycling's cargo insurer.

> [T]he more the job went on, the more the stockpiles of copper, it looks like copper that had just been tipped out of the same kind of one-[ton] bags that they had been loaded into. It was freshly acquired copper scrap that had come off of de-insulating machines or other forms of production. Everything looked like the same material.

(*Id.* 166:22-167:3.) Ultimately, the investigator was not able to conclusively resolve this suspicion, which was based on an "overwhelming sense" arising from "scrutinizing the photographs" over approximately twenty (20) hours, because there were not enough photographs where details of the serial numbers on the bags of copper were visible for comparison. (*Id.* 59:10-17, 158:16-20, 167:4-24.) The investigator found no indication that ASI, Gibbs, or Southern Recycling were involved in any fraudulent or criminal activity, and concluded that Gibbs and Southern Recycling were innocent victims of a "well known metal cargo substitution fraud that has been perpetrated by Asian crime syndicates in Manila for some years." (*Id.* 57:14-19, 151:2-24, 165:7-21.)

Given the investigator's findings, Southern Recycling and its insurer, CNA Insurance Company, Limited ("CNA"), filed, on November 18, 2013, a lawsuit against Gibbs in this Court, captioned: *S. Recycling, LLC, et al. v. Gibbs Int'l, Inc.*, No. 7:13-cv-3125-BHH ("Companion Case"). The complaint in the Companion Case alleged:

> CNA's investigation into the matter concluded that the containers had been tampered with which allowed the doors to be opened without breaking the seals, that only the initial Copper placed in the first two (2) containers probably ever existed, that this same Copper was removed from the first two (2) containers and thereafter was placed into and removed from each of the remaining containers in a similar manner (in each circumstance being replaced by cement blocks or slag), that this was done prior to arrival of the containers at the Port of Manila, and that the removals occurred either while the containers were left overnight at Regent Phoenix's inland warehouse or at some point along the route to the Port of Manila.

(Compl. ¶ 19, Companion Case ECF No. 1 at 4.) Moreover, the complaint stated,

"Based upon the small quantity of Copper that may have actually existed, CNA paid to Southern Recycling the amount of U.S. $366,518.00 . . . ." (*Id.* ¶ 20.) Asserting a cause of action for breach of contract, Southern Recycling sought return of the payments it made to Gibbs in the amount of approximately $1.7 million. However, Gibbs was unable to recover the monies it paid to Regent Phoenix, approximately $1.3 million, and refused to refund the payments made by Southern Recycling. Gibbs made a claim to ACE for coverage pertaining to loss of the copper prior to the Companion Case being filed, but ACE denied Gibbs' claim and refused to defend or indemnify Gibbs in the Companion Case. Gibbs, therefore, brought this action against ACE seeking a declaratory judgment as to coverage under its policy with ACE and asserting a claim for breach of contract. (*See* Compl., ECF No. 1-1.)

In the Companion Case, the Court granted partial summary judgment in Southern Recycling's favor on the discreet legal issue that, pursuant to the "F.O.B. Port" delivery term in the purchase agreement, Gibbs was obligated to deliver the copper wire in containers to the Port of Manila and, if Gibbs failed to satisfy this obligation, Gibbs bore the risk of loss. (March 31, 2016 Order, Companion Case ECF No. 65 at 4, 25.) Subsequently, the Court denied Gibbs' motion for leave to file an amended answer and motion for reconsideration. (January 11, 2017 Order, Companion Case ECF No. 74.) Thereafter, the parties fully resolved the Companion Case via mediation and the case was dismissed. (Companion Case ECF Nos. 81 & 82.)

The upshot of this factual context, considered *in toto*, is that Gibbs clearly had a ripe breach of contract action against Regent Phoenix for the monies it paid and/or its loss of profit on the transaction with Southern Recycling—though Regent Phoenix was,

not surprisingly, unresponsive to Gibbs' inquiries regarding the failed shipment.[3] Relatedly, Gibbs had exposure—now resolved through mediation in the Companion Case—to Southern Recycling for Gibbs' failure to supply the agreed upon consideration despite accepting and retaining the purchase price. At issue in the case *sub judice* is whether coverage exists for Gibbs' loss or its liability.

## II.     The Policy at Issue

ACE issued International Advantage Commercial Insurance Policy No. PHF D37931901 to Gibbs for the period June 15, 2012 to June 15, 2013 (the "Policy"). (*See* ECF No. 24-1.) The Policy includes multiple coverage forms, including but not limited to coverage forms for commercial property damage and general liability. The Commercial Property Coverage Form provides:

### II.     PROPERTY DAMAGE

#### A.     PROPERTY AND PERILS INSURED

> **1.**     The Company will pay for **direct physical loss or damage** occurring during the Policy Period **to the property described in sub-paragraph A.4.** below at an Insured Location (hereinafter, "**Covered Property**") within the Coverage Territory, directly caused by or resulting from any Covered Cause of Loss and **not otherwise excluded herein**; provided that, prior to the beginning of the Policy Period, no Insured knew or reasonably should have known that such loss or damage had occurred, in whole or part. If any Insured knew or reasonably should have known that such loss or damage occurred in whole or in part at the time the Policy Period begins, then any continuation, change or resumption of such loss or damage during or after the Policy Period will be deemed to have been known prior to the Policy Period, and will not be covered under this Coverage Form.

---

[3] Gibbs' representative at the Sucat warehouse, Mr. Hemsath, attempted to contact Regent Phoenix's principal, Roger Lee, after discovery of the fraud, but never heard from Mr. Lee again. (*See* Hemsath Dep. 82:12-84:10, ECF No. 53-8 at 5.)

2.     If covered loss or damage begins during the Policy Period and continues after the end of the Policy Period, the ending of the Policy Period will not cut short coverage under this Coverage Form for such loss or damage.

3.     **The Company will only pay for covered loss or damage to the extent of the interest of the Insured in the Covered Property.**

4.     **Covered Property**, except as otherwise excluded herein, **means the following**:

. . .

    c.     **Personal Property that is owned by**:

        **(1)     the Insured**, including the Insured's interest as a tenant in improvements and betterments to buildings or structures. In the event of direct physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of such improvements and betterments, notwithstanding any contract or lease provision to the contrary.

        **(2)**     officers or employees of the Insured.

        **(3)     others that is in the Insured's custody, to the extent of the Insured's legal liability under a written contract or agreement assumed prior to loss or damage, for physical loss or damage of the type insured against under this Coverage Form**, provided that no other insurance is available to the Insured, including, but not limited to, any warehouseman's legal liability insurance.

            **(A)**     The Company will defend that portion of any suit against the Insured alleging liability for such loss or damage and seeking damages on account thereof, even if such suit is groundless, false or fraudulent. The Company may, without prejudice, investigate, negotiate and settle any claim or suit at its discretion.

            **(B)**     The Company has no duty to defend the Insured against a suit seeking damages for direct physical loss or damage to which this

insurance does not apply.

**(C)** ***The amount the Company will pay for damages and defense costs and expenses is limited to the Sub-Limit of Liability for Legal Liability shown in item VI.B. SUB-LIMITS OF LIABILITY of the Declarations.*** The Company's right and duty to defend end when such Sub-limit of Liability has been used up in the payment of judgments, settlements and/or defense costs and expenses.

(*Id.* at 137-39 (emphasis added).) The corresponding sub-limit of liability for "Legal Liability" in the referenced declarations is shown as: "NOT COVERED." (*Id.* at 23.)

The Policy's Commercial General Liability ("CGL") Coverage Form itemizes the parameters of third party coverage provided. (*See id.* at 34-63.) It states, in relevant part, that ACE "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (*Id.* at 34.) The CGL Coverage Form further provides that ACE "will have the right and duty to defend the insured against any 'suit' seeking damages for . . . 'property damage' . . . . [and] the right to settle any such 'suit.'" (*Id.*) However, it stipulates that ACE "will have no duty to defend the insured against any 'suit' seeking damages for . . . 'property damage' to which this insurance does not apply." (*Id.*) The CGL insurance applies to "property damage" only where such damage "is caused by an 'occurrence' that takes place in the 'coverage territory' . . . ." (*Id.*) Moreover, the CGL Coverage Form sets forth the following definitions of relevant terms:

**SECTION V – DEFINITIONS**
. . .

21. ***"Occurrence" means an accident***, including continuous or repeated exposure to substantially the same general harmful

conditions. All such exposure to substantially the same general conditions shall be considered as arising out of the same "occurrence"; regardless of the frequency or repetition thereof, or the number of claimants.

. . .

26. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(*Id.* at 59, 61.)

### III.    Procedural Background

ACE filed its motion for summary judgment on July 13, 2017. (ECF No. 53.) Gibbs responded on July 27, 2017 (ECF No. 54), and Southern Recycling filed a one-page response joining in Gibbs' opposition (ECF No. 55). On August 3, 2017, ACE filed its reply. (ECF No. 58.) The matter is ripe for adjudication and the Court now issues the following ruling.

## LEGAL STANDARD

**Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by

"citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. A litigant is unable to "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

Where the Court is presented with the question of whether an insurance policy covers a particular claim, in the absence of a genuine dispute regarding the underlying facts, summary judgment is the proper mechanism by which to determine whether coverage is available. *See OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, 242 F. App'x 936, 939 (4th Cir. 2007) ("Because the facts are undisputed and we are presented with a purely legal question of insurance coverage, the case is ripe for summary judgment.").

**South Carolina Insurance Law**

In South Carolina, "[i]nsurance policies are subject to the general rules of contract construction," and the "cardinal rule o f c o n t r a c t interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Auto Owners Ins. Co. v. Benjamin*, 781 S.E.2d 137, 141 (S.C. Ct. App. 2015) (quoting *Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626, 628 (S.C. 2012)). "Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning." *Id.* Where the terms of an insurance policy are ambiguous or conflicting, courts must construe those terms "liberally in favor of the insured and strictly against the insurer." *Id.* In other words, "where policy provisions may be reasonably interpreted in more than one way, the court must use the interpretation most favorable to the insured." *CAMICO Mut. Ins. Co. v. Jackson CPA Firm*, No. 2:15-cv-1823-PMD, 2016 WL 7403959, at *8 (D.S.C. Dec. 22, 2016)

(citing *State Farm Fire & Cas. Co. v. Barrett*, 530 S.E.2d 132, 136 (S.C. Ct. App. 2000)). "'[T]he Court will look to the reasonable expectations of the insured at the time when he entered into the contract if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print.'" *State Farm Fire & Cas. Co. v. Morningstar Consultants, Inc.*, C.A. No.6:16-cv-01685-MGL, 2017 WL 2265919, at *2 (D.S.C. May 24, 2017) (quoting *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 407 (2014)) (alteration in original). However, "[this] doctrine is not a rule granting substantive rights to an insured when there is no doubt as to the meaning of policy language," *id.* (quoting *Bell*, 757 S.E.2d at 407), and "the insurer's duty under a policy of insurance . . . cannot be enlarged by judicial construction." *Id.* (citing *S.C. Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. 1990)). "The court's duty is limited to the interpretation of the contract made by the parties themselves regardless of its wisdom or folly, apparent unreasonableness, or failure of the parties to guard their interests carefully." *B.L.G. Enterprises, Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999) (quotation marks, alteration, and citation omitted).

"[U]nder South Carolina law, '[q]uestions of coverage and the duty of a liability insurance company to defend a claim brought against its insured are determined by the allegations of the [underlying] complaint.'" *Auto Owners Ins. Co. v. Pers. Touch Med Spa*, LLC, 763 F. Supp. 2d 769, 776 (D.S.C. 2011) (quoting *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574, 578 (S.C. 2009)). In South Carolina, the duty to defend is broader than the duty to indemnify. *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 809 F. Supp. 2d 449, 457 (D.S.C. 2011). "If the underlying complaint creates a

*possibility* of coverage under an insurance policy, the insurer is obligated to defend."

*City of Hartsville*, 677 S.E.2d at 578 (citing *Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co*, 265 S.E.2d 38 (S.C. 1980)) (emphasis added).

This Court has previously explained, "[T]he duty to defend is triggered where the underlying complaint includes *any allegation* that raises the possibility of coverage." *Allstate Ins. Co. v. Ingraham*, No. 7:15-cv-3212-BHH, 2017 WL 976301, at *5 (D.S.C. Mar. 14, 2017) (quotation marks and citation omitted). "[C]lauses of inclusion should be broadly construed in favor of coverage, and when there are doubts about the existence or extent of coverage, the language of the policy is to be 'understood in its most inclusive sense.'" *Cook v. State Farm Auto. Ins. Co.*, 656 S.E.2d 784, 786 (S.C. Ct. App. 2008) (quoting *Buddin v. Nationwide Mut. Ins. Co.*, 157 S.E.2d 633, 635 (1967)). "Courts should not, however, 'torture the meaning of policy language in order to extend' or defeat coverage that was 'never intended by the parties.'" *Cook*, 656 S.E.2d at 786-87 (quoting *Torrington Co. v. Aetna Cas. & Sur. Co.*, 216 S.E.2d 547, 550 (S.C. 1975)).

The possibility of coverage triggering an insurer's duty to defend may also be determined by facts outside of the complaint that are known by the insurer. *City of Hartsville*, 677 S.E.2d at 578 (citing *USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 798 (S.C. 2008)). In *City of Hartsville*, the Supreme Court of South Carolina indicated that orders issued by the underlying trial court may be considered when determining whether the underlying claims create a possibility of coverage under an insurer's liability policy. *See* 677 S.E.2d at 576-80.

## DISCUSSION

### I.    Applicability of the Policy's Commercial Property Coverage Form

Defendant argues that the Policy's Commercial Property Coverage Form does not apply to the loss of copper because, under the terms of the Policy, Gibbs cannot establish: (1) that it sustained a direct physical loss; (2) that this loss was sustained by Covered Property; (3) that this loss was directly caused by a Covered Cause of Loss; (4) that the cause of this loss was not excluded by the Policy; and (5) that it had an interest in the property at the time of loss. (ECF No. 53-1 at 15-16.) Accordingly, Defendant contends that it is entitled to summary judgment because it need only show that Gibbs lacks sufficient evidence to prove its breach of contract claim against ACE. *See Roper Hosp., Inc. v. United States*, 869 F. Supp. 362, 366 (D.S.C. 1994); *Garrett v. Pilot Life Ins. Co.*, 128 S.E.2d 171 (S.C. 1962) ("[T]he insured [has] the burden of showing that his injury was covered by the terms of the policy.") (citations omitted).

First, Defendant cites this Court's ruling in the Companion case that under the F.O.B. Port delivery term in Gibbs' agreement with Southern Recycling, "delivery" was not achieved until the copper was put into the hands of the ocean carrier at the Port of Manila. (*See* Companion Case ECF No. 65 at 10.) Gibbs' agreement with Regent Phoenix contained a materially identical delivery term. (*See* ECF No. 24-2 at 2.) Therefore, Defendant argues, Gibbs did not "own" the copper that it contracted for until it was delivered to the Port. Because all the available evidence indicates that the substitution of the containers' contents occurred prior to arrival at the Port, Defendant avers that Gibbs never acquired an ownership interest in the copper and that the copper falls outside the coverage limitations of the Policy.

Second, Defendant argues that the necessary corollary to Gibbs' lack of ownership over the copper is that the "loss" sustained was the funds transferred by Gibbs to its faithless contract partner, Regent Phoenix, not the copper itself. Defendant notes that a loss must be to "Covered Property" in order to invoke coverage, and Section II(B)(1) of the Commercial Property Coverage Form provides that "Covered Property" does not include "accounts, bills, currency, food stamps or other evidence of debt, money, notes [or] securities." (ECF No. 24-1 at 139.) Even if the lost funds could be considered "Covered Property," Defendant asserts, Gibbs' did not sustain a "direct loss" because losses incurred as a result of bad business deals or third-party fraud are deemed indirect. *See, e.g.*, *Lissauer v. Fireman's Fund Ins. Companies*, 459 F. App'x 67 (2d Cir. 2012) (affirming district court's finding, as a matter of law, that monies lost during twenty years of investing in the Madoff Ponzi scheme did not constitute direct loss).

Third, Defendant argues that the Policy's additional coverage for goods in transit does not apply. As an initial matter, the Commercial Property Coverage Form specifically excludes from the "Covered Property" definition: "property in transit, except as otherwise provided by this Coverage Form." (ECF No. 24-1 at 140.) However, the "Transit" provision under the "Additional Coverages" section states:

> This Coverage Form covers the following Personal Property, except as excluded in the sub-paragraphs below or elsewhere in this Coverage Form, while such Personal Property is in due course of transit by any means of conveyance (except ocean marine vessels and aircraft) within the Coverage Territory of this Coverage Form: (1) Personal Property owned by the Insured. (2) Personal Property of others in the Insured's custody, to the extent of the Insured's interest or legal liability.

(*Id.* at 156.) Yet, the "Additional Coverages" section makes clear that additional

coverages "are subject to the applicable LIMIT OF LIABILITY and SUB-LIMITS OF LIABILITY shown in Item VI. of the DECLARATIONS," that they "will not increase the Occurrence Limit," and that they "are subject to all provisions of this Coverage Form, including applicable exclusions and Deductibles." (*Id.* at 141-42.) Thus, Defendant avers that Gibbs' claim to additional coverage under subsection (1) of the "Transit" provision is no more successful than its general claim to coverage under the Policy because it did not "own" the copper within the meaning of that provision, and it cannot designate specific facts showing that a specific quantity of copper was "in due course of transit" when it disappeared—i.e., there is no evidence to show precisely where in the warehouse-to-Port pipeline the copper was removed from any particular container. (*See* ECF No. 53-1 at 21-22.) Moreover, Defendant asserts that subsection (2) of the "Transit" provision cannot save Gibbs' claim because there is no evidence that copper was ever in Gibbs' "custody"—i.e., Mr. Hemsath's intermittent presence at the Sucat warehouse during loading did not constitute dominion over the goods, and Regent Phoenix was responsible for "all costs of loading [and] inland freight to Manila port" under the terms of its agreement with Gibbs. (*See id.* at 22.)

Fourth, Defendant contends that even if Gibbs' loss of funds could be construed as a direct loss to Covered Property, coverage would be excluded because the Policy provides that it does not cover "loss, damage, cost, or expense resulting from the voluntary parting with title to or possession of property if induced by any fraudulent scheme, trick, device, or act or by false pretense." (ECF No. 24-1 at 159.) Moreover, the Commercial Property Coverage Form also excludes any "mysterious disappearance,

loss or shortage disclosed on taking inventory, or any unexplained loss."[4] (*Id.* at 158.)

Finally, Defendant argues that *if* Gibbs acquired an ownership of some copper prior to

delivery, *then* Regent Phoenix must have been transporting that copper to the Port on

Gibbs' behalf, in which case the loss would be excluded as arising from "[a] dishonest

act, including but not limited to theft, committed alone or in collusion with others, at any

time . . . by any proprietor, partner, director, trustee, or officer of any business or entity

(other than a common carrier) engaged by an Insured to do anything in connection with

Covered Property." (*Id.* at 161.)

In response, Plaintiff argues that under the ordinary, dictionary definitions of

"owned," which means "belonging to," and "loss," which includes losing something, it is

reasonable to conclude that Gibbs owned approximately 500,000 pounds of copper wire

that was subsequently stolen from thirteen shipping containers, such that there was a

"direct physical loss" of property owned by the insured. (*See* ECF No. 54 at 20.) Plaintiff

asserts that the terms of Gibbs' agreement with Regent Phoenix demonstrate "the intent

of the contracting parties . . . for Gibbs to purchase 500,000 pounds of actual copper

wire, and not just a contractual right to delivery of the copper at a later date." (*Id.* at 20-

21.) Moreover, Plaintiff asserts that Defendant mischaracterizes the import of the

Court's ruling in the Companion Case with respect to Gibbs' ownership interest over the

copper, and states, "Even if the Court were inclined to agree with ACE that Gibbs did

not acquire any ownership interest in the copper before delivery to the Port, it has not

been established as a matter of fact precisely when and where the containers were

---

[4] Courts have upheld the application of this type of "mysterious disappearance" exclusion. *See, e.g.*, *Maurice Goldman & Sons, Inc. v. Hanover Ins. Co.*, 607 N.E.2d 792 (N.Y. App. 1992) (holding that an exclusion for "unexplained loss," "mysterious disappearance," and "loss or shortage discovered on taking inventory," was unambiguous and applied to exclude jewelry loss where insured's president could not say how or where loss occurred).

robbed." (*Id.* at 21-22.)

It should be remembered that an insurance policy does not, in itself, bestow upon or deprive a party of property rights. Not surprisingly, Plaintiff avoids directly addressing the F.O.B. Port term in Gibbs' agreement with Regent Phoenix when discussing Gibbs' putative ownership over the copper. The term is materially identical to the delivery term at issue in the Companion Case. In its ruling on Southern Recycling's motion for partial summary judgment in the Companion Case, under a section entitled "The F.O.B. Term and Its Meaning Under the Commercial Code," the Court stated:

> Section 36-2-319 of the South Carolina Commercial Code, entitled "F.O.B. and F.A.S. terms," states in relevant part:
>
> > (1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a *delivery term* under which
> >
> > > (a) when the term is F.O.B. the *place of shipment*, the seller must *at that place* ship the goods in the manner provided in this chapter (Section 36-2-504) and *bear the expense and risk of putting them into the possession of the carrier* . . . .
>
> S.C. Code § 36-2-319 (emphasis added). The Official Comment section of the statute describes the general purpose of the F.O.B. provisions in the Commercial Code, stating: "This section is intended to negate the uncommercial line of decision which treats an 'F.O.B.' term as 'merely a price term.'" S.C. Code Ann. § 36-2-319, cmt. 1. Moreover, the associated South Carolina Reporter's Comments state, ***"In addition to being a price term, the parties also use the term to indicate the point at which title passes and delivery takes place," and with respect to § 36-2-319(1)(a), "In addition to the allocation of payment of freight charges, the risk of loss during handling and shipment passes to the buyer at the F.O.B. point." S.C. Code Ann. § 36-2-319.***

(Companion Case ECF No. 65 at 5-6 (emphasis added).) In other words, the reason Gibbs' bore the risk of loss under the Southern Recycling contract was precisely because title to the goods did not transfer to the buyer until the F.O.B. point had been

reached. The same is true of Gibbs' agreement with Regent Phoenix, Plaintiff's references to amorphous sources of ownership rights notwithstanding. This determination of when ownership rights would transfer squares with a reconciliation of the two contracts, in the first of which seller Regent Phoenix warrants its absolute right, title, and interest in the copper, and in the second of which seller Gibbs makes no such warranty. (*Compare* ECF No. 24-2 at 2 (Additional Terms), *with* ECF No. 24-3 at 2 (Other Terms).) Given that the remaining contractual terms are in all relevant respects the same, the Court can only assume that Gibbs' omission of any claim to title in the second contract was intentional. (*See id.*) It is clear, then, that Gibbs' title and interest in the goods was set to spring into existence at the same moment it transferred those rights to Southern Recycling. Thus, the Court agrees with Defendant that the loss of the copper itself falls outside the coverage limits of the Policy insofar as the claim for "Covered Property" is premised upon Gibbs' putative ownership of the property in question. (*See* Commercial Property Coverage Form, Section II.A.4.c.(1), ECF No. 24-1 at 138 (including "Personal Property that is owned by . . . the Insured").) Importantly, to the extent "Covered Property" might be premised upon Gibbs' legal liability for loss or damage to the property of others that was in Gibbs' "custody," the applicable sub-limits of liability in the declarations indicate that such legal liability was "NOT COVERED." (*See id.* Section II.A.4.c.(3)(C) (including "Personal Property that is owned by . . . others that is in the Insured's custody"); Commercial Property Declarations VI.B., ECF No. 24-1 at 23 (indicating no coverage for legal liability pertaining to commercial property).)

In its opposition brief, Plaintiff itemizes the following as a list of "material facts [that] remain in dispute":

1. The point or points in time at which thieves stole the copper cargo from each of the thirteen shipping containers and replaced the cargo with concrete blocks or slag—none of the representatives for Gibbs or Southern Recycling re-opened the containers after they were loaded and sealed at the warehouse in Sucat and no one knows for sure what was in the containers at each leg of the journey. (*See* Biggerstaff Dep. 150; Boozer Dep. 161; Hemsath Dep. 57; Gibbs Exhibits 28, 33, & 34).

2. The location or locations from which thieves stole the copper cargo from each of the thirteen shipping containers and replaced the cargo with concrete blocks or slag— again, none of the representatives for Gibbs or Southern Recycling re-opened the containers after they were loaded and sealed at the warehouse in Sucat and no one knows for sure what was in the containers at each leg of the journey. (See Biggerstaff Dep. 150; Boozer Dep. 161; Hemsath Dep. 57; Gibbs Exhibits 28, 33, & 34). Additionally, some of the containers stayed in Sucat overnight, but three containers were loaded with copper and departed for the Port on the same day. (See Ford Dep. 82–83; Gibbs Exhibits 28, 33, & 34).

3. Whether or not the copper cargo was "recycled"—CNA's investigator testified that he had an "informed suspicion" that the copper may have been recycled, but he admitted he did not have "conclusive evidence" of recycling. (Ford Dep. 59). Additionally, Southern Recycling's representatives who were physically present during the loading and shipping process were satisfied that 500,000 pounds of copper were present and properly delivered. (See Dignos Dep. 76–77, 83–85, 131; Boudreaux Dep. 29; Ford Dep. 109–13).

(ECF No. 54 at 7-8.) Putting aside the fact that this list is composed of the same essential concept recycled three different ways—namely, "no one knows" precisely what happened to the copper that was loaded or when it was removed—it is immediately apparent that any "dispute" implicated by these facts is not "genuine." *See Anderson*, 477 U.S. at 257. Plaintiff has not set forth *any evidence* to suggest that the copper loaded into Southern Recycling's shipping containers in Sucat was removed at some other point along the shipping journey than either: (1) the warehouse, or (2) en route to the Port. Merely highlighting the investigator's inability to establish the precise point or modality of theft with certainty does not, in itself, invalidate the ample evidence that exists to support the conclusion that the copper was removed *before* the containers

entered the Port. (*See* Ford Dep. 28:15, 32:16-33:2, 58:25-59:17, 158:21-160:4, 165:23-168:5, ECF No. 54-11 at 9-10, 17, 42-43.) The assertion that the removal *might* have happened at some other unidentified location along the shipping route is pure speculation and is belied by: (1) signs of tampering with the shipping containers materializing between the warehouse and the Port (as reflected in ASI's photographs); (2) dramatically different weights for some containers between the warehouse and the Port, but matching weights for those same containers between the Port and arrival in Dallas; and (3) indisputably manipulated EIRs submitted by Regent Phoenix to mask the weight differentials and gain payment from Gibbs. (*Id.*) Plaintiff cannot avoid the entry of summary judgment by isolating insignificant sources of uncertainty in the record and buttressing that uncertainty with speculation. *See Beale*, 769 F.2d at 214; *Ennis*, 53 F.3d at 62. The law requires the Court to construe the facts in the light most favorable to Plaintiff and draw all *reasonable* inferences in Plaintiff's favor. It does not, however, compel the Court to ignore the clear import of record evidence or pretend that such evidence does not exist. The only evidence available to determine "when and where the containers were robbed" clearly shows that the fraud occurred prior to Port entry.

Plaintiff next argues that Defendant has not met its burden of establishing that the exclusions on which it relies are applicable. With respect to the exclusion that precludes coverage for loss that results from "any fraudulent scheme, trick, device, or act or by false pretense," Plaintiff merely asserts, "ACE cannot establish that this exclusion applies because Gibbs did not 'voluntarily part[] with title to or possession of property.'" (ECF No. 54 at 23.) Assuming for the sake of argument that the copper loaded into containers at the warehouse was in Gibbs' "possession"—a factual claim

that has virtually no support in the record given the terms of the Regent Phoenix agreement and Mr. Hemsath's intermittent presence at the warehouse—it is hard to square this assertion with what actually happened. It is unclear how Plaintiff can say that it did not voluntarily relinquish such putative possession when it left the containers at the warehouse overnight and entrusted Regent Phoenix with sole responsibility for delivery to the Port. Moreover, it is undisputed that the loss of the copper was induced by a fraudulent scheme. Suffice it to say, this exclusion applies inexorably to the facts at issue and coverage would be excluded even if the lost copper qualified as "Covered Property."

With respect to the exclusion that precludes coverage for loss that is "unexplained" or arises from a "mysterious disappearance," Plaintiff argues simply that there was no "mysterious disappearance" or "unexplained loss" because the copper was "stolen by thieves at some point in the logistics chain." (ECF No. 54 at 22-23.) However, it is hard to reconcile this argument with Plaintiff's repeated insistence that "no one knows for sure" what happened to the contents of the containers after they were loaded. (*See id.* at 5, 7-8.) In any event, the "mysterious disappearance" exclusion would only be triggered as an alternative to the "fraudulent scheme" exclusion—i.e., if one were to blindly ignore the clear indicators of fraud present in the record—which the Court has already found directly applicable under the circumstances.

Plaintiff does not even attempt to explain why the exclusion of coverage for loss that arises from "[a] dishonest act, including but not limited to theft" by any "officer of any business or entity . . . engaged by an Insured to do anything in connection with Covered Property" should not apply. (ECF No. 24-1 at 161.) This is understandable

given Plaintiff's repeated assertions that "theft" occurred, and given the unavoidable significance of Regent Phoenix doctoring the EIRs submitted to Gibbs for payment and Regent Phoenix principal, Roger Lee's, refusal to respond to Gibbs' inquiries (*see supra* n.3). Accordingly, the Court finds that this exclusion provides an additional bar to coverage.

Next, Plaintiff argues that the "Transit" provision under the "Additional Coverages" section saves its claim: "To the extent that any of the thefts occurred when the copper was 'in due course of transit,' this 'Additional Coverages' section applies because, as explained above, Gibbs owned the copper at the time of the loss and there was a direct physical loss of the copper." (ECF No. 54 at 23-24.) Plaintiff also notes that the specific exclusions advanced by Defendant do not apply to additional coverage for transit losses. (*Id.*; *see* Section II.C.31.c., ECF No. 24-1 at 157 (itemizing a limited subset of exclusions that apply to the "Transit" provision).)

Although the "Transit" provision eliminates the general exclusion of "property in transit" from the definition of "Covered Property" (*see* Section II.B.8., ECF No. 24-1 at 140), the other limitations in that definition remain in full force and effect. It bears repeating that the "Additional Coverages" section explicitly states the additional coverages "are subject to the applicable LIMIT OF LIABILITY and SUB-LIMITS OF LIABILITY shown in Item VI. of the DECLARATIONS" and "are subject to all provisions of [the Commercial Property] Coverage Form." (Section II.C.1.a. & c., ECF No. 24-1 at 141-42.) Thus, merely asserting that the goods were lost "in transit" does not escape the problems that frustrate Gibbs' generic property loss claim explained above: (1) a lack of "ownership" over the copper, and (2) no coverage for legal liability pertaining to

the property of others in the insured's "custody." (*See supra* at 22-23.) In other words, the "Transit" provision does not somehow provide special status to goods "in transit" such that the property in question need not satisfy the typical definitional requirements to qualify for coverage. Moreover, even if Plaintiff was able to surmount these impediments to its invocation of the "Transit" provision, it would have to be able to set forth specific facts showing that definite quantities of copper were "in due course of transit" when they were stolen. *see Celotex*, 477 U.S. at 322-23; *see also Sunex Int'l, Inc. v. Travelers Indem. Co. of Ill.*, 185 F. Supp. 2d 614, 617 (D.S.C. 2001) ("The burden of proof is on the insured to show that a claim falls within the coverage of an insurance contract." (citing *Gamble v. Travelers Ins. Co.*, 160 S.E.2d 523, 525 (S.C. 1968)). Plaintiff would be hard pressed to do so given its confessed lack of knowledge as to the fate of the copper once the containers were sealed at the warehouse. Correspondingly, the Court would be hard pressed to construe "due course of transit" to include what Defendant aptly describes as the "undisputed criminal machinations of Regent Phoenix." (*See* ECF No. 53-1 at 22.)

Finally, Plaintiff argues that if coverage exists under the basic insuring agreement of the Commercial Property Coverage Form for property that was stolen while it was not in "due course of transit," then Gibbs would be entitled to coverage up to the limit of liability under that agreement, namely $3,800,000. (*See* ECF No. 24-1 at 22.) With respect to property stolen while in transit, there is a limit of $125,000 per occurrence, subject to a $25,000 deductible per occurrence. (*See id.* at 24, 26.) Plaintiff asserts that there was an "occurrence" each time copper was stolen from an individual shipping container, and that thirteen separate policy limits for transit losses should be allowed.

(ECF No. 54 at 24-26.) However, these questions are moot because the Court has already determined that Gibbs did not suffer a loss to "Covered Property," and even if it had coverage would be excluded due to the modality of loss.

In summary, the Court finds that no genuine dispute of material fact remains as to coverage under the Commercial Property Coverage Form, and grants summary judgment to Defendant on this basis.

## II.     Applicability of the Policy's Commercial General Liability Form

The South Carolina Supreme Court has explained that, while a CGL insurance policy "provides coverage for all the risks of legal liability encountered by a business entity, with coverage excluded for certain specific risks," CGL insurance "is not intended to insure business risks, i.e., risks that are normal, frequent, or predictable consequences of doing business, and which business management can and should control or manage." *Auto Owners Ins. Co., Inc. v. Newman*, 684 S.E.2d 541, 547-48 (S.C. 2009) (citing *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318 (S.C. Ct. App. 1995), *aff'd*, 468 S.E.2d 304 (1996) (general liability policy is intended to provide coverage for tort liability for physical damage to property of others; it is not intended to provide coverage for insured's contractual liability which causes economic losses)) (quotation marks and citations omitted).

The CGL Coverage Form at issue covers "property damage" caused by an "occurrence" that takes place in the "coverage territory." (ECF No. 24-1 at 34.) Defendant argues, generally, that Plaintiff cannot substantiate its burden to prove "property damage" and an "occurrence" as defined in the Policy. (*See* ECF No. 53-1 at 25-29.) Questions of coverage and the duty of an insurance company to defend a claim

brought against its insured are determined by the allegations in the underlying complaint. *Auto Owners Ins. Co. v. Pers. Touch Med Spa*, LLC, 763 F. Supp. 2d at 776. Here the allegations in Southern Recycling's complaint against Gibbs were that the copper was removed prior to the containers arrival at the Port of Manila, that Gibbs breached its contract with Southern Recycling by failing to deliver the copper as specified, and that Southern Recycling suffered damages principally in the form of the purchase price it paid to Gibbs. (Compl. ¶¶ 19, 24-27, Companion Case ECF No. 1 at 4.)

Defendant argues, and the Court agrees, that the loss implicated in Southern Recycling's complaint against Gibbs does not constitute "property damage" under the terms of the CGL Coverage Form. The Policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property," and "loss of use of tangible property that is not physically injured." (ECF No. 24-1 at 61.) In general, economic damages do not qualify as "property damage." *See, e.g.*, *Auto-Owners Ins. Co. v. Carl Brazell Builders, Inc.*, 588 S.E.2d 112, 115-16 (2003) (holding, under an identical "property damage" definition, that no property damage occurred and contractors' CGL policies provided no coverage because homeowners alleged only economic damages). As already detailed above, neither Southern Recycling nor Gibbs ever obtained title to the copper that was placed into the shipping containers at the warehouse. When Gibbs failed its contractual duty to deliver the copper, Southern Recycling sought to hold Gibbs responsible for its substantiated damages, which were primarily the purchase price that Gibbs refused to refund. These damages were economic in nature and do not qualify as "property damage" under the CGL Coverage

Form.

Moreover, Southern Recycling's allegations in the Companion Case do not implicate an "occurrence" as defined in the CGL Coverage Form. Gibbs' refusal to refund the purchase price was an intentional and considered choice and cannot reasonably be construed as an "accident." (*See* ECF No. 24-1 at 59); *see also CRC Scrap Metal Recycling, LLC v. Hartford Cas. Ins. Co.*, No. 7:12-146-HMH, 2012 WL 4903661, at *4-5 (D.S.C., October 15, 2012) ("Injury that is caused directly by negligence must be distinguished from injury that is caused by a deliberate and contemplated act initiated at least in part by the actor's negligence at some earlier point. The former may be an accident.") Thus, the Court finds that the Companion Case did not allege property damage arising from an "occurrence" and, therefore, did not raise the possibility of coverage under the CGL Coverage Form.

Finally, the CGL Coverage Form contains an exclusion for "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract." (ECF No. 24-1 at 35.) Even if Plaintiff was able to show that the Companion Case involved "property damage" arising from an "occurrence," this provision would apply and exclude coverage for Gibbs' assumption of liability in its contract with Southern Recycling. This finding is consistent with the principle recognized in South Carolina that a general liability policy is intended to provide coverage for tort liability, not economic losses from the insured's contractual liability. *See Isle of Palms Pest Control*, 459 S.E.2d at 320

In conclusion, the Court finds that no genuine issue of material fact remains as to coverage under the CGL Coverage Form, and grants summary judgment to Defendant

on this basis.

## **CONCLUSION**

After careful consideration of the parties' briefs and the associated record the Court hereby GRANTS Defendant's motion for summary judgment (ECF No. 53). Thus, the Court finds, as a matter of law, that neither Gibbs' loss to Regent Phoenix nor Gibbs' liability to Southern Recycling were covered by the Policy.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 30, 2018
Greenville, South Carolina